A. C. WARNACK AND SHIRLEY WARNACK, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

BETTY WARNACK BOUDREAU, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 879–77, 1507–77.    Filed January 15, 1979.

*Robert J. Smith* and *Emilio T. Gurrola,* for the petitioners in docket No. 879–77.

*Claude P. Kimball,* for the petitioner in docket No. 1507–77.

*John W. Harris,* for the respondent.

STERRETT, *Judge:* Respondent's motion to consolidate the above two cases was granted on January 11, 1978. Respondent determined deficiencies in income taxes paid by petitioners A. C. Warnack and Shirley Warnack, husband and wife (docket No. 879–77), for the following years and in the following amounts:

---

| TYE Dec. 31— | Deficiency |
|---|---|
| 1971 | $13,913.03 |
| 1972 | 16,322.00 |
| 1973 | [1]35,661.00 |
| 1974 | 14,552.00 |
| Total | 80,448.03 |

Respondent determined deficiencies in income taxes paid by petitioner Betty Warnack Boudreau (docket No. 1507–77) for the following years and in the following amounts:

| TYE Dec. 31— | Deficiency |
|---|---|
| 1969 | $3,983.65 |
| 1971 | 6,154.00 |
| 1972 | 3,334.00 |
| 1974 | 6,151.75 |
| Total | 19,623.40 |

The deficiency for Mrs. Boudreau's taxable year 1969 is due to a disallowance by respondent of a net operating loss carryback taken by her to her 1969 taxable year from her 1972 taxable year. After concessions made by the parties, the only issue before the Court is whether petitioner Betty Warnack Boudreau must include in her gross income, under section 71, I.R.C. 1954, and whether petitioners A. C. and Shirley Warnack may, therefore, deduct under section 215, certain payments made by A. C. and Shirley Warnack to Mrs. Boudreau during the years in issue.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference.

Shirley Warnack is a party herein solely by virtue of having filed jointly with her husband A. C. Warnack. Petitioners in docket No. 879–77 will, therefore, be referred to collectively as Warnack or husband. Petitioner Betty Warnack Boudreau, docket No. 1507–77, will be referred to herein as Mrs. Boudreau or former wife. At the time she filed her petition herein, Mrs.

[1]The deficiency shown for 1973 does not take into account a payment of $23,768 ($20,872 principal and $2,896 interest) made by petitioners in docket No. 879–77 on Oct. 29, 1975.

Boudreau maintained her legal residence in Tehachapi, Calif. At the time he filed his petition herein Warnack maintained his legal residence in Lancaster, Calif. The parties filed a joint return for their taxable year ended December 31, 1969, with the Internal Revenue Service Center, Ogden, Utah. Warnack filed his 1971 return at Ogden, Utah. There is no evidence as to where he filed his returns for his taxable years ended December 31, 1972, 1973, and 1974. Mrs. Boudreau filed her individual income tax return for her taxable years ended December 31, 1971, 1972, and 1974 with the Internal Revenue Service at Fresno, Calif. Both Warnack and Mrs. Boudreau are on the cash basis and use the calendar year as their tax accounting period.

A. C. and Betty Warnack were married in Pascagoula, Miss., on September 3, 1949. Sometime thereafter the couple moved to California. The record does not indicate how much, if any, property was acquired by the couple outside California and before they established their domicile in that State. The parties proceed on the assumption that all the property belonging to the couple at the time of their divorce was community property subject to division under the laws of California. We, therefore, find this as a fact. There were three children born of the union. The youngest was born February 20, 1958.

After coming to California, Warnack worked and invested in the construction business—at which work and investment he was apparently very successful. By 1968 he was a 50-percent owner of a combination of six interlocking construction companies. These companies were: (1) Excavation Construction Co., (2) Manhattan Electric Co., Inc., (3) Santa Fe Engineers, Inc., (4) Lancal Equipment Co., Inc., (5) Littlerock Aggregate Co., Inc. (sometimes referred to as the Antelope Valley Aggregate Co., Inc.), and (6) Construction Repair Co., Inc. At all times relevant in 1968, Santa Fe Engineers, Inc. (Santa Fe), was a 50-percent joint venturer in two projects: (1) The S & S Constructors' project at Vandenberg Air Force Base (the VAFB project), and (2) the LTMCO Steel and Fabricating Co.

On September 30, 1968, after some 19 years of marriage, Betty Warnack filed a complaint for divorce from her husband.[2] After an order to show cause hearing held in the Los Angeles County

---

[2] The parties separated and agreed to live permanently apart on or about Sept. 21, 1968.

Superior Court on October 15, 1968, Warnack was ordered, by an order dated October 22, 1968, to pay to his then wife $1,450 per month for her support and to enable her to pay the trust deed payments on the couple's home. Warnack was, in addition, ordered to pay to his estranged wife a total of $400 per month for the support of two of the couple's children, and to pay attorney's fees in the amount of $10,000, and C.P.A. and appraisal fees not to exceed $10,000.

On July 28, 1969, and pursuant to their divorce, the parties entered into a document entitled "Property Settlement Agreement" (agreement). This agreement was written by Mrs. Boudreau's attorney, Ned R. Nelsen (Nelsen), a member of the California bar who at the time he wrote the agreement had approximately 15-years experience as a divorce attorney. At the time of the divorce herein, Nelsen had restricted his practice to marital dissolutions involving, for the most part, community estates in excess of $100,000. For his services in the Warnack divorce, Nelsen was paid $25,000.

The agreement says, in relevant part:

2. RECITALS:

\*        \*        \*        \*        \*        \*        \*

(d) The parties hereto desire by this Agreement to finally adjust as between themselves their respective property rights and to terminate their respective obligations of support of the minor children of the parties.

3. COMMUNITY PROPERTY OF THE PARTIES:

\*        \*        \*        \*        \*        \*        \*

There was a serious dispute as to the valuations ascribed to the assets set forth as the community property of the parties. After long, arduous and considerable negotiations, Husband and Wife, with the advice of her counsel, have reached the settlement as set forth herein.

4. DIVISION OF COMMUNITY PROPERTY:

The parties agree that the following property shall be the sole and separate property of Wife, and Husband does hereby forever waive any rights in or to the said property, and does hereby transfer, assign and convey unto Wife as her sole and separate property any and all interest which he may have as Husband, or otherwise, in and to said property or any part thereof:

\*        \*        \*        \*        \*        \*        \*

(f) $20,600.00 cash on the execution of this Agreement;

(g) $20,000.00 cash one year from the date of this Agreement.

5. PAYMENTS TO WIFE:

(a) Husband agrees to pay to Wife $2,125.00 per month for one hundred twenty-one (121) months, commencing August 1, 1969, and on the first of each and every month thereafter until the full 121 payments have been made. Any payment not made within ten (10) days of due date is to draw interest at seven

percent (7%) from the date it was due until paid. To secure the payment of these sums Husband agrees that he shall pledge the stock in the above named corporations to Wife * * * . This provision is entered into with the understanding and on the condition that Wife includes these payments in her income for income tax purposes and that Husband be permitted to deduct these payments for Federal and State income tax purposes. In the event the Internal Revenue Service holds that these payments are not deductible by Husband and not includable in the income of Wife, in that event Wife shall remit to Husband the amount she would have paid as taxes on these payments had they been included in her income.

It is expressly understood and agreed that the provisions for payment to Wife shall not be subject to modification, either as to amount or as to the duration of payment. Said payments are not to terminate upon the remarriage of Wife, and in the event of her death they are payable to her estate and are a charge against the estate of Husband.

7. TAXES:
For the year 1969, if either party requests the other to join in a joint return, the parties shall file jointly, provided said request is made thirty (30) days prior to the date the return shall be due. Each party shall pay his pro rata share of taxes based upon the income they received, and in this connection Wife's income shall be deemed to commence as of August 1, 1969. * * *

10. RELEASE, WAIVER AND FINALITY CLAUSES:
Except as otherwise provided in this Agreement—

(a) Each party to this Agreement does hereby release the other from any and all liabilities, debts or obligations, of every kind or character, heretofore or hereafter incurred, and from any and all claims and demands, including all claims of either party upon the other for support and maintenance as Wife or as Husband, and it being understood this present Agreement is intended to settle the rights of the parties hereto in all respects, and without limiting the generality of the foregoing, the Wife expressly waives alimony and support except as herein provided in paragraph 5.

16. Wife has been represented and advised in the negotiations for and in the preparation of this Agreement by the counsel of her own choosing, and she has read this Agreement and has had it fully explained to her by such counsel, and is fully aware of the contents thereof and its legal effect. Husband has chosen not to have counsel represent him in the negotiations for and in the preparation of this Agreement, but has negotiated the terms of this Agreement with the assistance of his Certified Public Accountant, Mr. William Wheeler, for financial advice. * * *

The agreement, as part of its paragraph 3, listed all the community's property. Paragraph 4 of the agreement divided the community property among the members of the community.[3]

---

[3]In this connection, we note that each member of the community is under a fiduciary duty to the other member to reveal the full extent of the community property under his dominion or control. The parties remain tenants in common with respect to all community property not dealt with in the dissolution proceedings. *In Re Marriage of Cobb*, 68 Cal. App. 3d 855, 137 Cal. Rptr. 670, 673 n. 1 (1977).

The various properties allocated, their recipient, and the value put thereon by either the agreement (A) or the parties' stipulations (S) before this Court, are as follows:

| Item Number— | Property | Recipient Husband | Wife |
|---|---|---|---|
| 1 | Kerrick Street real property · | | $24,650 (S) |
| 2 | Mortgage on the Kerrick Street property | $6,500.00 (S) | |
| 3 | South Lake Tahoe real property, house, floating docks, boat, furnishings, snow mobiles | | 75,000 (S) subject to mortgage of $26,000 (S) |
| 4 | Wife's personal effects | | 15,000 (S) |
| 5 | China, silver, crystal | | 5,000 (S) |
| 6 | 1968 Lincoln | | 5,000 (S) |
| 7 | Lancaster Blvd., real property house, furnishings, surrounding additional lots | 95,000.00 (S) subject to mortgage of $23,000.00 | |
| 8 | Note secured by trust deed on real property at 15th & P in Palmdale, Cal. | 11,000.00 (A) | |
| 9 | 1/3 interest in equity in 80 acres in section 34 | 22,000.00 (S) subject to mortgage of $10,667.00 (S) | |
| 10 | 1/2 interest in equity in 30 acres in section 26 | 7,500.00 (S) | |
| 11 | Husband's personal effects | 5,000.00 (S) | |
| 12 | 1/2 of all stock of the Construction Repair Co., Inc. | 37,267.40 (A) (book value as of 9/30/68) | |
| 13 | 1/2 of all stock in the Lancal Equipment Co., Inc. | 78,305.77 (A) (book value as of 9/30/68) | |
| 14 | 1/2 of all stock in the Manhattan Electric Co., Inc. | 31,092.68 (A) (book value as of 9/30/68) | |
| 15 | 1/2 of all stock in the Excavation Construction Co. | 47,820.02 (A) (book value as of 9/30/68) | |
| 16 | 1/2 of all stock in the Antelope Valley Aggregate Corp. | 74,771.00 (A) (book value as of 9/30/68) | |
| 17 | 1/2 of all stock in Santa Fe Engineers, Inc. | 275,783.55 (A) (book value as of 9/30/68) | |
| 18 | Cash | | 40,600 (A) |
| | Total net of mortgages | 649,373.42 | 139,250 |

Thus, Warnack received property with total stipulated fair market and book values net of all mortgages of $649,373.42. His former wife received property with net agreed to and book values of $139,250, plus payments of $2,125 per month for 121 months, or $257,125 for a total of $396,375.[4] The 121-month

[4]In their agreement, the parties used Sept. 30, 1968, a date a week after their separation, as the operative date for valuation purposes. At the hearing held herein, the parties directed themselves to the question of whether Santa Fe's book value as of Sept. 30, 1968, was correctly stated in the agreement. We too, therefore, direct ourselves to Santa Fe's book value as of that date. We intend no inference as to that date's importance under California law. The use of book values is perhaps one source of the conflict giving rise to this action. Book value is not necessarily fair market value. Also, when a corporation is involved in completed-contract-method joint ventures, as was Santa Fe herein, it is axiomatic that the corporation's book value will not reflect unfinished venture contracts.

period was proposed by Warnack for the purpose of making the payments taxable to Mrs. Boudreau.

The language of the agreement was incorporated in substantially identical wording in the Interlocutory Judgment of Dissolution of Marriage issued by the court on February 20, 1970, and entered February 24, 1970. The final Judgment (marriage) of Dissolution, which incorporated the provisions of the Interlocutory Judgment, was entered June 7, 1971. Since signing the agreement, Warnack has timely made all payments due thereunder.

Warnack and his former wife filed a joint return for their taxable year ended December 31, 1969. For his taxable year ended December 31, 1971, Warnack deducted, by amended return, $25,500 as a Form 1040, line 25, miscellaneous deduction labeled "Alimony Betty Warnack." This deduction had not been included in his original return for that taxable year. For her taxable year ended December 31, 1971, Mrs. Boudreau included this same $25,500 in income and paid income taxes thereon—but she also labeled the income as being for "community property division." In each of his taxable years ended December 31, 1972, 1973, and 1974, Warnack deducted as a miscellaneous deduction his payments to his former wife under the agreement. In her taxable year 1972, Mrs. Boudreau excluded her receipts from Warnack from income and filed a claim for refund (Form 843), for the taxes paid on the payments included in income for her taxable year ended December 31, 1971. She, apparently, has since then continuously followed the practice of excluding her receipts from Warnack from income.

While Mrs. Boudreau, apparently, took some employment after her divorce, the vast majority of her income has come from Warnack's payments. At the time of her divorce and for sometime prior, she had no job and had never worked. California law, at the time of her separation and divorce from Warnack, provided that an aggrieved spouse was entitled to spousal support in an amount sufficient to support her in the style to which she was accustomed, provided the husband had the financial means. In the type of situation involved here, i.e., a 19-year marriage, three children, etc., a California court would normally have given her an award of spousal support.

Since the tax law obviously does not permit a deduction by Warnack of the payments to his wife and an exclusion by her of

the same payments, respondent sent statutory notices of deficiency to both, taking inconsistent positions by denying the deduction to one and including the payments in income of the other, reserving in effect the role to himself of stakeholder.

OPINION

Warnack contends that the monthly payments in issue were paid as alimony and hence are deductible by him in accordance with the provisions of section 215, I.R.C. 1954. He cites paragraphs 5 and 10(a) of the Property Settlement Agreement in support of his view. Mrs. Boudreau, on the other hand, argues that the monthly payments in reality represent a part of the division of the couple's community property and, as such, their receipt is a nontaxable event to her. To buttress her contention she notes that only by concluding that such payments in aggregate are part of the property settlement does the otherwise apparently disparate amount allocated to each in the agreement make sense.

Mrs. Boudreau's cross to bear is the effect of the paragraphs of the agreement cited above, including the specific language in paragraph 5(a) that: "This provision is entered into with the understanding and on the condition that Wife includes these payments in her income for income tax purposes and that Husband be permitted to deduct the payments for Federal and State income tax purposes."

Mrs. Boudreau seeks to accomplish her task by way of two basic contentions. First, citing section 71(a)(2) she argues that the payments herein were not made because of a family or marital relationship, but were made, as mentioned, in recognition of her property interest in the community. Secondly, citing section 71(a) and (c), she argues that the payments herein are not periodic because they are not in discharge of a "principal sum" and because they are not required to be made over a period in excess of 10 years from the date of the property settlement agreement, which is the only available document dated more than 10 years from the last payment date. We conclude that the facts herein do not support her arguments, and that the payments herein are in fact includable in Mrs. Boudreau's gross income under the terms of the above section 71,[5] and are

---

[5]SEC. 71. ALIMONY AND SEPARATE MAINTENANCE PAYMENTS.

(a) GENERAL RULE.—

\*      \*      \*      \*      \*      \*      \*

consequently deductible to Warnack under the terms of section 215.[6]

Section 71(a)(2) says that if a wife is separated from her husband and there is a written separation agreement executed after August 16, 1954, then her gross income includes periodic payments received by her after such agreement is executed and which are paid under such agreement and because of the marital or family relationship. Section 71(a)(2) does not apply to any year for which the husband and wife filed jointly.

In our case, the parties are separated, and we clearly have a written separation agreement executed after August 16, 1954. By this agreement, the parties purported to settle finally all the points of conflict between them and to end, once and for all, their marital relationship and the material and spiritual involvements appurtenant. It is also clear that all the payments here in issue were made and received after such agreement was executed, and that these payments were made pursuant to such agreement. These are all conditions precedent to the applicability of section 71(a)(2).

But the statute adds two more requirements which must both be satisfied before the payments here at issue may be considered to fall within its ambit and which are both the object of Mrs. Boudreau's attack: (1) The payments must be made "because of the marital or family relationship," and (2) they must be "periodic." The section 71(c) test for "periodicity," which is the test at issue here, provides that the payments must be payable for a period in excess of 10 years from the date of the decree, instrument, or agreement, and they must constitute a principal

---

(2) WRITTEN SEPARATION AGREEMENT.—If a wife is separated from her husband and there is a written separation agreement executed after the date of the enactment of this title [Aug. 16, 1954], the wife's gross income includes periodic payments (whether or not made at regular intervals) received after such agreement is executed which are made under such agreement and because of the marital or family relationship (or which are attributable to property transferred, in trust or otherwise, under such agreement and because of such relationship). This paragraph shall not apply if the husband and wife make a single return jointly.

[6]SEC. 215. ALIMONY, ETC., PAYMENTS.

(a) GENERAL RULE.—In the case of a husband described in section 71, there shall be allowed as a deduction amounts includible under section 71 in the gross income of his wife, payment of which is made within the husband's taxable year. No deduction shall be allowed under the preceding sentence with respect to any payment if, by reason of section 71(d) or 682, the amount thereof is not includible in the husband's gross income.

sum. Further, the regulations put a gloss on the statute's marital or family relationship requirement saying:

> Sec. 1.71–1(b)(4) *Scope of section 71(a).* Section 71(a) applies only to payments made *because of the family or marital relationship in recognition of the general obligation to support which is made specific by the decree, instrument, or agreement.* [Emphasis added.]

Thus, Mrs. Boudreau's "family or marital relationship" argument also goes to the regulation's "support" requirement. We shall first discuss Mrs. Boudreau's arguments on the "family or marital relationship" issue, and then treat her objections to a finding that Warnack's payments to her are "periodic."

The "support" language in the above-quoted regulation was meant as an elaboration, not an extension, of the marital or family relationship requirement. *Bishop v. Commissioner,* 55 T.C. 720, 724 (1971). The "marital or family relationship" requirement is the obverse of the requirement that, to be deductible, the payments must be in the "nature of alimony or an allowance for support." See, e.g., sec. 1.71–1(d)(3)(i)(*b*), Income Tax Regs. The regulation simply points out that the question of whether the payments are made because of the "marital or family relationship" can be answered by determining whether the payments involved are in discharge of the "support" obligation specified in section 1.71–1(b)(4), Income Tax Regs., or are, in the alternative, in discharge of some proprietary obligation of the husband to the wife. Many of the cases in the "marital or family relationship" area have dealt with that issue in terms of whether or not the payments in issue were for the wife's "support." See, e.g., *Landa v. Commissioner,* 206 F.2d 431 (D.C. Cir. 1953), and 211 F.2d 46 (D.C. Cir. 1954), revg. on other grounds a Memorandum Opinion of this Court; *United States v. Soltermann,* 272 F.2d 387 (9th Cir. 1959), revg. and remanding 163 F. Supp. 397 (S.D. Cal. 1958).

A review of the cases in the "support" area reveals that the courts have not focused merely on whether the payments are for "support"—rather the approach has been to determine whether the payments are for support in contradistinction to being in exchange for the wife's release of some property interest. The question of whether a payment is in recognition of the husband's obligation of support (and is, therefore, made because of the marital or family relationship) is meaningful only if it is considered in connection with the question of whether the

payments are in recognition of and for the extinguishment of some property interest of the wife. If the payments are of the former sort, they are probably periodic and hence section 71 income to the wife. If the payments are of the latter sort, then they are in the nature of capital expenditures by the husband and are neither deductible to him nor taxable to her, except to the extent the wife recognizes gain thereon. See *Bishop v. Commissioner, supra* at 725.

This approach to the "support" requirement is reflective of the origins of section 71. Section 71 was mainly a relief provision to save husbands from the burden of excessive income taxes on income over which they never, except formally, had dominion and control, i.e., payments for which the husband functioned, in effect, as a mere conduit. The precursor of section 71 was, therefore, framed with the payment of *income* from husband to former wife in mind. Congress did not intend this provision to tax mere property divisions. It is at this distinction that the regulation's "support" language is aimed.

While the support/property distinction is clear in theory, it is often difficult to define in practice. Each case must be considered on its own facts. See *United States v. Mills*, 372 F.2d 693, 696 (10th Cir. 1966). The courts are not bound in these cases to the labels attached to the payments by the parties. See, e.g., *Mirsky v. Commissioner*, 56 T.C. 664 (1971). The courts are free to receive oral testimony with respect to the true nature of the transaction—as opposed to its mere form. *Bardwell v. Commissioner*, 318 F.2d 786, 789 (10th Cir. 1963).

But the courts should not attempt to plumb the depths of the minds of the litigants in search of their "true" intention if some better basis of decision is available.[7] Thus, if we should find that, from all the facts, there was a substantially equal division of the community's property without regard to the payments here at issue, we would certainly have to conclude that the payments in issue were for Mrs. Boudreau's "support" because we would have precluded a finding that they were with respect to Mrs. Boudreau's "property." Recognizing this fact, Mrs. Boudreau

---

[7]This is especially true in litigation like this between former spouses. In such cases emotions are often high. Many times the intention of the parties' with respect to any one point is in conflict or nonexistent. Respondent's interest is usually only that of a stakeholder, i.e., to see to it that one of the parties' pays tax on the income involved. The dollar amounts are often small. In a case such as this, *certitude* is the watchword. Only when the law is clear enough that planning is feasible can the parties and courts put such cases behind.

points to the one-sidedness of the property value figures shown above and says that despite any unfortunate appearances from the wording of the agreement to the contrary, her 121 monthly payments are in furtherance of the partys' division of their community property.[8] Warnack counters by seeking to show that the value shown in the agreement for Santa Fe was knowingly overstated by the parties by some $645,111.59 and that the true value of the community's interest in Santa Fe at the time of the divorce was really a loss of approximately $369,328.04. If this is true, then the division of property stated in the agreement is substantially equal before the 121 payments are taken into account.[9]

In pursuance of his theory, Warnack introduced evidence at trial that the true book value at the relevant time of his one-half interest in Santa Fe was a loss of $369,328.04, not the $275,783.55 shown on the chart above.[10] This evidence was presented by way of William Robert Wheeler (Wheeler), a certified public accountant who had been, as of the time of trial, associated with the Warnack companies as an outside auditor since the latter part of 1960. Wheeler was also present during the last 3 weeks of the negotiations between Warnack and Nelsen leading up to the signing of the agreement, and was present when the agreement was signed. As one of the Warnack companies' outside auditors, Wheeler generally audited the various company books annually. The VAFB and LTMCO joint venture ledgers were, however, reviewed and a general ledger posted monthly. Wheeler testified that from his review of Santa Fe's records it was his opinion that

---

[8] The total cash payments to be made to wife over the 121 months equal $257,125. If this amount is subtracted from the value of the property apportioned to husband, and added to the value of wife's property, the division appears more equal:

| | Mrs. Boudreau | Warnack |
|---|---|---|
| Property FMV | $139,250 | $636,373.36 |
| Payments | 257,125 | (257,125.00) |
| Total | $396,375 | 379,248.36 |

Mrs. Boudreau did not attempt to discount the value of her payments over the 121 month period.

[9] If Warnack's figures are adopted, then it would appear that he received property with a value of $8,738.32 to Mrs. Boudreau's $139,250. We note here that our calculations yield values and totals different from those derived by either party's experts. The business of valuing such properties as completed-contract-method joint ventures is, however, less than perfect and, we believe our figures sufficient for the purposes of this case.

[10] Warnack also indicated that he felt that Antelope Valley Aggregate Corp. was overvalued in the agreement. Since our findings with respect to Santa Fe settle the matter, and since little evidence was introduced on this second point, we make no finding on Antelope's "true" book value on Sept. 30, 1968.

as of September 30, 1968, Santa Fe had an "anticipated" loss on the VAFB joint venture of $738,656.07, one-half or $369,328.04 of which was attributable to Warnack's 50-percent interest in Santa Fe. This would reduce the book value of Warnack's one-half of Santa Fe from a positive $275,783.55 to a negative $369,328.04. This loss was only "anticipated," and had not yet actually been incurred because, as mentioned in footnote 4 above, VAFB was on the completed-contract-method of accounting. Thus Wheeler would put the total value of the companies received by Warnack under the terms of the agreement as substantially less than the amount stated in the agreement. From all the evidence, we find that Wheeler's testimony is credible and we hold that, as of September 30, 1968, Santa Fe had a loss of $738,656.07, of which $369,328.04 was attributable to the community's interest in the company. Thus Mrs. Boudreau received at least 50 percent of the community's property.

Since the payments made to Mrs. Boudreau by Warnack under the agreement could not, therefore, be in exchange for any proprietary interest of hers in the community estate, we find that they were made for Mrs. Boudreau's support and because of the marital or family relationship.

This conclusion is supported by Mrs. Boudreau's situation at the time of the divorce. She had no job and no job skills. For all her taxable years in issue, Warnack's payments were Mrs. Boudreau's main source of support. It is reasonable to conclude that the parties foresaw this situation and dealt with it by providing for Mrs. Boudreau's support while she started a new life. Further, it is clear from the terms of the agreement that the parties intended these payments as "alimony" or support payments. For example, Nelsen, her own attorney, drafted paragraph 10(a) of the agreement which says, "Wife expressly waives alimony and support *except* as herein provided in paragraph 5." (Emphasis added.) Paragraph 5 is the paragraph setting out Warnack's obligation to make the 121 payments here at issue—and it is also the paragraph where Mrs. Boudreau agrees to include these payments in her income and to allow Warnack to deduct them. Finally, we note that paragraph 4 of the agreement, entitled "Division of Community Property" provides for a payment to Mrs. Boudreau of $40,000 in cash, while it is paragraph 5, entitled "Payments to Wife," that calls for the payments here at issue. This indicates that the parties did

not view these payments as part of the property division. When the provision for 121 monthly payments is considered with paragraph 10(a)'s "except" clause, we can only conclude that the parties intended these payments to be for Mrs. Boudreau's support *and* to be taxable to her and deductible by Warnack.

If the support question is highly factual, the second set of issues, which deals with whether the payments herein are "periodic," is subject to a more certain and predictable disposition. Here, the statute itself provides the means of interpreting the parties' intention so that no later equivocation or memory lapse is possible.

Section 71(a) taxes to the wife "periodic" payments made to her by her former spouse. The archetypal periodic payment is, of course, the standard "alimony" payment which the husband is typically required to make to his former wife until she dies or remarries. Frequently, the support/property issue is closely intertwined with the "periodic" requirement. Thus, if the payments extend for a period of less than 10 years and are not subject to any contingency, the support/property issue is moot because the payment cannot be periodic. Sec. 1.71–1(d)(3)(i), Income Tax Regs.

While the statute itself does not expressly define what payments will be considered "periodic," there are at least two tests for whether payments made under a decree, instrument, or separation agreement will be so considered: (1) The 10-year test of section 71(c)(2), and (2) the contingency test of section 1.71–1(d)(3) and (4), Income Tax Regs. Because we find that the payments herein qualify as periodic under the 10-year test, we need not reach the contingency test.[11] The 10-year test first looks to whether the payments involved are stated in the instrument in terms of, or can be computed to be equivalent to a "principal sum." If they are so stated or can be so computed, then the next inquiry is whether they are payable for a period ending more than 10 years from the date of the agreement. If they are so payable, then the payments are includable in the wife's income and deductible by the husband, subject to the 10-percent

---

[11]We do note, however, that normally, payments which are not contingent will not be periodic unless they are payable over a period ending more than 10 years from the date of the decree, instrument, or agreement. Sec. 1.71–1(d), Income Tax Regs. On brief Mrs. Boudreau argued that the payments herein are not subject to any contingencies. We agree. But this conclusion is useless for Mrs. Boudreau's purpose unless we then also conclude that the payments are payable for a period of less than 10 years. As we see below, we find that the payments are for a period in excess of 10 years.

limitation of section 71(c)(2), regardless of whether they are subject to a contingency or not. Sec. 1.71–1(d)(4), Income Tax Regs.

The principal sum and 10-year requirement are discussed next in order below:

(a) *Principal sum.*—Mrs. Boudreau argues that there is no principal sum stated in the agreement because the total amount of the payments to be made to her is not set out therein. An appeal in this case would probably be to the Ninth Circuit, absent a stipulation to the contrary by all the parties. Sec. 7482(b). Almost 25 years ago, that Circuit announced its view that no principal sum was present when the total amount of the payments was not expressly stated in the agreement. *Myers v. Commissioner*, 212 F.2d 448, 450 (9th Cir. 1954). We had an opportunity to consider the *Myers* decision in the case of *Kent v. Commissioner*, 61 T.C. 133, 136–137 (1973).

*Kent* concerned an Arizona divorce action in which the husband was obligated by the decree of divorce to pay his former wife $600 per month for 54 months. As petitioner in this Court, the husband argued, referring to *Myers*, that no principal sum was stated in the decree of divorce therein because the total amount of payments due was not set out. While our opinion in that case was appealable, absent a stipulation to the contrary, to the Ninth Circuit, we refused to apply our rule in *Golsen v. Commissioner*, 54 T.C. 742 (1970). This was because *Myers* was decided 3 years before the adoption, in 1957, of section 1.71–1, Income Tax Regs. We felt that the intervening adoption of these regulations had changed the judicial climate sufficiently that *Myers* was not controlling in the facts then before us. We said:

> Notwithstanding that the Ninth Circuit appears to have espoused petitioner's argument, we do not feel constrained, under the facts before us, to find *Myers* controlling. What vitality a literal reading of *Myers* may have is suspect in view of the development of the law in the 19 years since promulgated. [*Kent v. Commissioner, supra* at 137; fn. ref. omitted.]

Our view of *Myers* has not changed since *Kent*. We again hold that *Myers* is not controlling on the facts before us. Present law does not require an express statement of the total amount due before that amount can constitute a "principal sum." Thus, it is clear that we have, in the facts before us, a principal sum stated in the agreement. We can, through the use of "mere mathematics," determine that $2,125 x 121 = $257,125.

(b) *Over 10 years.*—The next and most important question is whether this principal sum is payable over a period ending more than 10 years from the date of the agreement within the meaning of section 71(c)(2). The answer to this question depends on a combination of the parties' intent with respect to the source of Warnack's obligation to pay, and the governing State law. *Prince v. Commissioner,* 66 T.C. 1058, 1063 (1976). The *Prince* decision also involved a California marital dissolution. The payments there in issue were similar to those in our case. They were not subject to any of the contingencies listed in section 1.71–1(d)(3)(i), Income Tax Regs., and they were to be made in 121 monthly installments. The Prince's divorce action had been called for trial on October 29, 1965. On that same day, the parties had entered into an oral agreement, on the record, with respect to the terms of their divorce. The interlocutory decree was entered on November 30, 1965. Mrs. Prince, the petitioner before the Tax Court, received her first payment on or about November 1, 1965. *Prince v. Commissioner, supra* at 1061. We there held that the *source* of the husband's obligation to pay alimony was the stipulation agreement made in open court on October 29, 1965, *not* the later interlocutory decree. *Prince v. Commissioner, supra* at 1063–1064. We found that California law clearly authorized the parties to enter into such a binding legal agreement with respect to their property rights, and that, from all the facts, the parties had intended that stipulation as the obligating event which fixed the husband's obligation to make the 121 payments.

The California law relevant to the *Prince* decision is also the law applicable to the 1969 agreement before us. The relevant California Civil Code provisions are set out below.

Section 139. * * *

The provisions of any agreement for the support of either party shall be deemed to be separate and severable from the provisions of the agreement relating to property. All orders for the support of either party based on such agreement shall be deemed law imposed and shall be deemed made under the power of the court to make such orders. The provisions of any agreement or order for the support of either party shall be subject to subsequent modification or revocation by court order except as to any amount that may have accrued prior to the order of modification or revocation, and except to the extent that any written agreement, or if there is no written agreement, any oral agreement entered into in open court between the parties, specifically provides to the contrary. All such orders of the court for the support of the other party, even if there has been an agreement of the parties, may be

enforced by the court by execution, contempt, or by such other order or orders as the court in its discretion may from time to time deem necessary. * * *

Section 158. Contracts with each other and third persons

Husband and Wife May Make Contracts. Either husband or wife may enter into any engagement or transaction with the other, or with any other person, respecting property, which either might if unmarried; subject, in transactions between themselves, to the general rules which control the actions of persons occupying confidential relations with each other, as defined by the Title on Trusts.

Section 159. Contracts; property; separation

A husband and wife cannot, by any contract with each other, alter their legal relations, except as to property, and except that they may agree, in writing, to an immediate separation, and may make provision for the support of either of them and of their children during such separation.

[Cal. Civ. Code tit. 1 was repealed by Stats. 1969, c. 1608, p. 3313, sec. 3, operative Jan. 1, 1970.]

Thus it is clear that in 1969, California law contemplated the power of the parties to bind themselves to a property settlement agreement which also entailed a support settlement—as is the case in the agreement. Cf. *Egan v. Egan*, 251 Cal. App. 2d 577, 59 Cal. Rptr. 705 (1967); *Lane v. Lane*, 117 Cal. App. 2d 247, 255 P.2d 110 (1953); *In Re Marriage of Nicolaides*, 39 Cal. App. 3d 192, 114 Cal. Rptr. 56 (1974).

Furthermore, it is clear that, in the case before us, the parties intended the agreement to be the source of Warnack's obligation to pay. The first payment thereunder was due beginning on August 1, 1969, 3 days after the agreement was signed. Said payments were specifically made payable in all events regardless of the death or remarriage of either party. Effective the day the agreement was signed Mrs. Boudreau released Warnack—

(a) * * * from any and all liabilities, debts or obligations, of every kind or character, heretofore or hereafter incurred, and from any and all claims and demands, including all claims of either party upon the other for support and maintenance as Wife or as Husband, and it being understood this present Agreement is intended to settle the rights of the parties hereto in all respects, and without limiting the generality of the foregoing, the Wife expressly waives alimony and support except as herein provided in paragraph 5.

Finally, we note that the language of the agreement was integrated, substantially word-for-word, into the interlocutory judgment issued herein. We believe that the intendment of the parties, and the effect of the agreement, was to exclude all contingencies, including change of economic condition of the

parties, from Warnack's obligation to make payments to Mrs. Boudreau—and to fix that obligation by means of, and as of the date of, the agreement.

Since the date of the agreement, July 28, 1969, is more than 10 years before the due date of the last payment thereunder, August 1, 1979, this would conclude Mrs. Boudreau's case except for her final argument—that if the agreement is found to be the document whose date starts the running of the section 71(c)(2) 10-year period, then the requirements of section 71(c)(2) cannot be met because the parties filed jointly in 1969.[12] This argument is based on the last sentence 71(a)(2) which says: "This paragraph shall not apply if the husband and wife make a single return jointly."

This sentence was appended to the end of section 71(a)(2) and (a)(3) because the enactment of these subsections in 1954 presented problems with respect to the relationship between these subsections and section 6013. To disallow married but separated persons access to *both* section 6013 and section 71(a)(2) or (a)(3), and avoid ensuing confusion which could result, an election was created: subsection 71(a)(2) and (a)(3) will not apply to any taxable year for which spouses have filed jointly under section 6013. Subsec. 71(a)(2), last sentence, and (a)(3), last sentence.

Mrs. Boudreau cites no authority for support of her theory that section 71(a)(2) and (c)(2) are rendered inapplicable if the parties filed jointly for 1 year in the 10-year period. She misreads the section if she thinks that there is any basis to deny the applicability of section 71(a)(2) to payments made under a written separation agreement in one year because that section did not apply in another year. Nor is there any basis in the law upon which she could claim that section 71(a)(2) inapplicability in one year of the section 71(c)(2) 10-year period excludes that year from the 10-year period. The last sentence of section 71(a)(2) was intended merely to exclude the possibility that a

---

[12]Mrs. Boudreau said on brief:

"(iii) *Property Settlement Agreement:* The Property Settlement Agreement would appear to qualify as a written agreement pursuant to IRC sec. 71(a)(2) but since a joint return was filed for 1969, IRC sec. 71(a)(2) could not apply for 1969. Therefore, the first payment under the Property Settlement Agreement which might qualify as a periodic payment pursuant to a written agreement would be the payment made January 1, 1970. Thus, the periodic payments pursuant to a property settlement agreement, since they will end August 1, 1969, will be less than ten (10) years."

couple could claim the benefits of both section 71 and section 6013 for any one year. That sentence is not directed at the treatment of two separate and different taxable years. Further, it is axiomatic that the tax law functions by way of 12-month-long accounting periods (except in those cases where a 52-53-week fiscal year is allowed, sec. 441(f)), and that each taxable year stands on its own. See *Commissioner v. Sunnen*, 333 U.S. 591, 598–599 (1948); *Burnet v. Sanford & Brooks Co.*, 282 U.S. 359, 365 (1931). Thus, filing a joint return in one year of the section 71(c) 10-year period could not, of itself (even absent a provision such as is found in the last sentence of section 71(a)(2)), render section 71 inapplicable to all 9 of the *other* taxable years of the period. Such a result would frustrate the policy of certainty evident in section 71(c) because then its applicability in year one would be dependent on proof of the existence or nonexistence of some extraneous fact which may not occur until year 10.

Thus, it is clear that the last payment under the agreement, due on August 1, 1979,[13] is due more than 10 years from the date of the agreement, July 28, 1969. Since this is a period in excess of 10 years, the payments herein are "periodic."

Mrs. Boudreau's principal argument herein has been that the payments here involved are "property" payments, i.e., in pursuance of a division of the community property. In support of this argument, she has argued that we should ignore and set aside, as without meaning or effect, paragraphs 2(d), 5, 7, 10(a), and 16 of the agreement quoted above—which were written by her own attorney—but should enforce that part of the agreement relating to the valuation and division of the community's property. In effect, Mrs. Boudreau has argued that we should set aside—not the whole agreement, but only those portions of it which prejudice her case in this Court—what we might call a "selective set-aside." At the same time, Warnack argues that we should set aside those portions of the agreement which prejudice *him*, i.e., primarily those paragraphs which value his businesses. If we were to set aside the agreement, we can see no basis for doing so selectively. We choose not to set any portion of the agreement aside.

---

[13]The last payment would not be in default and bear interest until Aug. 10, 1979.

We hold that petitioner Warnack should prevail and that Mrs. Boudreau should not.

> *Decision will be entered for the petitioners in docket No. 879–77.*
>
> *Decision will be entered for the respondent in docket No. 1507–77.*