CHARLES W. TEST AND INGEBORG TEST, Petitioners v. COMMISSIONER OF INTERAL REVENUE, Respondent
Test v. Commissioner
Docket No. 5632-82.
United States Tax Court
T.C. Memo 1984-649; 1984 Tax Ct. Memo LEXIS 23; 49 T.C.M. (CCH) 307; T.C.M. (RIA) 84649; December 17, 1984. *23 Held, payment by petitioner to his former spouse was in the nature of support and therefore is deductible by petitioner under sec. 215, I.R.C. 1954. Fred E. Kilgore, for the petitioners. Warren P. Simsonsen, for the respondent. STERRETT MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: In his notice of deficiency dated December 11, 1981, respondent *24 determined a $994 deficiency in petitioners' Federal income tax for the year 1977. The sole issue for our decision is whether $5,000 paid by petitioner Charles W. Test to his former wife, Gladys Z. Good, in 1977 is deductible by petitioner Charles W. Test pursuant to section 215, I.R.C. 1954. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference. Petitioners Charles W. Test and Ingeborg Test, husband and wife, resided at 32 Brandy Court, Hanover, Pennsylvania at the time they filed their petition in this case. Petitioners filed a joint Federal income tax return for the taxable year 1977 with the Office of the Internal Revenue at Philadelphia, Pennsylvania. Petitioner Charles W. Test (hereinafter referred to as Charles or petitioner) and Gladys Z. Good (hereinafter referred to as Gladys) were married on January 22, 1950. At the time of their marriage both Charles and Gladys were 23 years old, *25 and neither of them had accumulated any worldly goods. Two children were born of the marriage. Immediately following the marriage, Charles worked as an employee for several builders. He thereafter went into the construction business and became the majority owner of C.W. Test Builder, Inc., a construction company (hereinafter referred to as Test Builder, Inc.). As an officer and director of Test Builder, Inc. during the marriage, Gladys received a salary from the business. Income from Test Builder, Inc. provided the wherewithal for the acquisition of all assets during the marriage. On April 6, 1976, after 26 years of marriage, Charles and Gladys entered into an Agreement in contemplation of separation, which professed "to make arrangements in connection with such separation, including the settlement of * * * [the parties'] property rights, the support and maintenance of Wife and other rights and obligations growing out of the marriage relationship." On June 29, 1976 Charles and Gladys were divorced. The divorce decree did not incorporate or merge the April 6, 1976 Agreement. During the negotiations concerning the terms of the Agreement and during the divorce proceedings, *26 both parties were represented by legal counsel. Charles was represented by Mr. Jay V. Yost (now deceased), and Gladys was represented by Mr. Lavere C. Senft. Various assets were acquired during the marriage.Some of the assets acquired were titled jointly in the names of Charles and Gladys, and other assets were titled individually. The ownership and values of the assets as considered during the negotiation of the Agreement by Mr. Senft, Gladys' attorney, were as follows: Jointly-Owned Property
Assets: Family residence
$160,000
88 shares of Test Builder, Inc. at
$915.91 per share
80,600
Lochner Farm
[2] 160,000
413 shares of Bank of Hanover at
8,260
$20 per share
Bank of Hanover Checking Account
1,912
Bank of Hanover Savings Account
649
Household furnishings
10,000
Total Joint Assets
$421,421
Liabilities: Mortgage on residence
$ 35,400
Mortgage on Lochner Farm
50,170
Total Joint Liabilities
85,570
Net jointly-owned property
$335,851
*27 Property Owned Solely by Charles W. Test
Assets: 119 shares of Test Builder, Inc.
at $915.91 per share
$108,993
1/3 interest Tradition House, Inc.
52,500
1/4 interest Quadco, Inc.
6,320
1/4 interest Wege property
7,500
Real Estate - 238 West Chestnut St.
12,500
Brinton Farm (net equity)
49,735
Long property (net equity)
22,000
Test Builder, Inc. Profit Sharing Plan
5,709
1974 Pontiac Firebird
3,800
Cash value - life insurance
4,640
Total
$273,697
Property Owned Solely by Gladys Z. Test
Assets: 2 shares of Test Builder, Inc.
$1,832
at $915.91 per share
Savings Account
1,965
Certificate of Deposit
1,000
Test Builder, Inc. Profit Sharing Plan
800
Total
$5,597
Summary
Joint Property
$335,851
Charles W. Test
273,697
Gladys Z. Test
5,597
Total
$615,145
Paragraph 6 of the Agreement was headed "Davision of personal property" and provided that (a) certain items of furniture, furnishings, equipment and other specified items of personal property would be divided between the spouses; (b) the jointly-owned 88 shares of stock of Test Builder, Inc. would be divided equally *28 and the two shares owned by Gladys individually would continue to remain her sole and separate property; (c) the jointly-owned 413 shares of stock of the Bank of Hanover would be divided, with Gladys receiving 206 shares and Charles receiving 207 shares; (d) the balance in the joint checking account at the Bank of Hanover would be divided equally, except that gladys" share would be increased by $20 to adjust for the value of the uneven distribution of the Bank of Hanover stock; and (e) the balance of the joint savings account at the Bank of Hanover would be divided equally. Paragraph 7 of the Agreement was headed "Real property." Section (a) of paragraph 7 provided that Charles would vacate the jointly-owned family residence, that the residence would be listed for sale, and that the net sales proceeds would be divided equally between the parties. It further provided that Gladys could remain in possession of the premises until such time as the property was sold. Charles would make all payments on any liens against the premises existing at the time of the agreement, and such payments of principal would be credited to Charles' share of the net sales proceeds. Charles would also pay *29 all expenses, except utilities, incurred in connection with the maintenance of the premises until such time as the property was sold. Section (b) of paragraph 7 provided that Gladys would convey and transfer to Charles all her right, title, and interest in the jointly-owned Lochner Farm, subject to all liens and encumbrances thereon, which Charles would assume and pay. The deed of conveyance would be executed and delivered to Charles within 45 days of the execution of the Agreement. Paragraphs 8 and 9 of the Agreement provided, respectively, that Charles would pay certain educational expenses of the children and that he would assign and transfer to each child the title to the respective vehicles that each child had been operating. Paragraph 10 of the Agreement provided that Charles would assume and pay all obligations jointly incurred by the parties. Paragraph 11 of the Agreement, which is of particular import for our purposes, provided, in part, as follows: 11. Property settlement. In full settlement of all other property rights and claims of Wife, Husband agrees to pay to Wife the sum of One Hundred Fifty-Three Thousand ($153,000.00) Dollars, payable as follows: *30 (a) Seventy-Eight Thousand ($78,000.00) Dollars within forty-five (45) days of the date of execution of this agreement; (b) Five Thousand ($5,000.00) Dollars within sixty (60) days of the date of execution of this agreement; (c) Seventy Thousand ($70,000.00) dollars payable in fourteen (14) equal annual installments of Five Thousand ($5,000.00) Dolars each, the first such payment to be paid one (1) year from the date hereof and annually thereafter on the same date, without interest. Husband shall execute and deliver to Wife a Note payable to Wife's order in accordance herewith * * *. Paragraph 11 of the Agreement further provided that Charles would cause to be conveyed a lot of Gladys' choice owned by Test Builder, Inc., or under certain circumstances and in substitution for such lot, $10,000. At Gladys' election, Charles also would cause Test Builder, Inc. to construct a dwelling house upon the lot, at a cost to Gladys equivalent to the actual construction cost, exclusive of profit. By paragraph 12 of the Agreement both Charles and Gladys waived any rights that either of them might have in the other's property or estate as a result of the marital relationship, *31 including for example, dower, thirds, curtesy, statutory allowance, widow's allowance, homestead rights, right to take in intestacy, and right to take against the will of the other. Paragraph 14 of the Agreement provided that the Agreement would survive any subsequent divorce the parties might obtain, and paragraph 16 of the Agreement provided that Charles would pay $7,500 of Gladys' legal fees incurred in connected with divorce proceedings. Paragraph 20 of the Agreement provided as follows: 20. Acceptance by Wife. The Wife acknowledges that the provisions of this agreement relating to settlement of property rights and support and maintenance are fair, adequate and satisfactory to her, and in keeping with her accustomed standard of living and her reasonable requirements. The Wife, therefore, accepts these provisions in full and final settlement and satisfaction of all claims and demands for property, alimony or for any other provision for support and maintenance, and fully discharges the husband from all such claims and demands except as provided in this agreement. Paragraph 26 of the Agreement provided that section headings contained in the Agreement were to *32 be disregarded in construing the Agreement. A schedule of the property owned subsequent to the divorce and the value of that property, as considered by Mr. Senft, Gladys' attorney, is set forth below: Asset or Liability
Gladys
Charles
Family residence
80,000 $ 80,000 88 shares of Test Builder, Inc.
40,300 40,300 Lochner Farm
160,000 413 shares of Bank of Hanover
4,120 4,140 Checking Account
956 956 Savings Account
344 324 Household furnishings
10,000 Mortgage on residence
(17,700)
(17,700)
Lochner mortgage
(50,170)
Charles' sole property
273,697 Gladys' sole property
5,597 Property settlement
153,000 (153,000)
Building lot
10,000 (10,000)
Counsel fees
(7,500)
286,617 [3] $321,047 Charles paid Gladys the $78,000 referred to in paragraph 11(a) of the Agreement, and within 60 days after the execution of the Agreement, he paid her the $5,000 *33 referred to in paragraph 11(b) of the Agreement. In addition, on April 6, 1976, Charles executed the promissory note referred to in paragraph 11(c) of the Agreement. By execution of the note, Charles promised to pay Gladys $70,000, without interest, the principal to be paid in 14 equal annual installments of $5,000 each commencing 1 year from the date of the note. The note provided for a confession of judgment in the event of default in any installment payment, and further provided that the note would bear interest at the rate of 8 percent per annum from the date of any default. In executing the note, Charles waived the right of inquisition upon any real estate which might be levied to collect any sums owing under the note. Petitioner made the first annual payment on the note by check dated April 5, 1977. He wrote the word "alimony" on that check. By letter dated April 12, 1977, Mr. Senft, Gladys' attorney, advised Charles that the word "alimony" was stricken from the check, "inasmuch as the payment is not alimony but is rather the property settlement installment which was due April 6, 1977 pursuant to Paragraph 11(c) of the Agreement and in accordance with the Promissory *34 Note of the same date." Simultaneously with the execution of the Agreement, Test Builder, Inc. and Gladys entered into a stock purchase and consulting agreement. Gladys agreed to sell to the company her 46 shares of stock in the company. Test Builder, Inc. agreed to pay Gladys a "consulting fee" for a term of 15 years in the amount of $12,000 per year for the first 10 years and $6,000 per year for the last 5 years. In addition, Test Builder, Inc. agreed to continue Gladys' benefits and coverage under the company's various employee plans, to periodically provide her with a new automobile, and to provide her with an allowance for automobile expenses. In the event of Gladys' remarriage, the consulting agreement was to terminate. Charles personally guaranteed the obligation of Test Builder, Inc. to pay Gladys the "consulting fee." Gladys never performed services pursuant to the consulting agreement. However, until Gladys' remarriage in February 1982, annual payments were made to her in accordance with the terms of the agreement. On his 1977 Federal income tax return, Charles deducted the $5,000 paid pursuant to paragraph 11(c) of the Agreement as alimony. Respondent *35 determined that the $5,000 was paid as the result of a property settlement and therefore disallowed the deduction. OPINION Section 71(a)(1) and (2) provides, in general, that periodic payments made under a decree of divorce or separate maintenance or under a written separation agreement, and imposed or incurred because of the marital or family relationship, are includable in the wife's gross income. Section 215 provides, in general, that a husband may deduct payments made to his wife that are includable in her gross income under section 71. The sole issue raised in this case is whether the $5,000 payment in question was made "because of the marital or family relationship." The statutory requirement that payments be made "because of the marital or family relationship" has been interpreted to require that the payments be for support rather than in settlement of some property interest of the wife. Section 1.71-1(b)(4), Income Tax Regs.; Schottenstein v. Commissioneer,75 T.C. 451, 456 (1980); Warnack v. Commissioner,71 T.C. 541, 550-551 (1979). If the payments are in settlement of some property interest, they are capital in nature *36 and therefore not subject to the provisions of section 71(a) or section 215. Thompson v. Commissioner,50 T.C. 522, 525 (1968). Petitioner argues that the $5,000 payment he made in 1977 pursuant to paragraph 11(c) of the Agreement was in the nature of support and therefore was deductible by him under section 215. Respondent, on the other hand, argues that the payment was in settlement of some property interest of petitioner's former wife and therefore not deductible by petitioner. While it is an easy enough task to describe in abstract terms the distinction between support and a property settlement, it is often difficult to apply the distinction in practice. Each case must turn on its own facts. Warnack v. Commissioner,supra at 551. The characterization of the payments does not depend on the labels that may or may not have been placed upon them. Beard v. Commissioner,77 T.C. 1275, 1283-1284 (1981); Hesse v. Commissioner,60 T.C. 685, 691 (1973), affd. without published opinion 511 F.2d 1393 (3d Cir. 1975), cert. denied 423 U.S. 834 (1975); Ryker v. Commissioner,33 T.C. 924, 929 (1960). *37 An important factor to consider is the intent of the parties. Schottenstein v. Commissioner,supra at 456. Unfortunately, as proved true in the instant case, testimony by the former spouses with respect to their intent is often contradictory and of little assistance in ascertaining the true nature of the payments in question. Accordingly, the courts have articulated a number of objective criteria that may tend to support one characterization of the payments as opposed to another. Having examined all of the relevant evidence in the record, keeping in mind the criteria articulated by the courts, we hold that the disputed payment was in the nature of support and therefore deductible by petitioner pursuant to section 215. To be sure, there exists a number of objective indicia which tend to support respondent's conclusion that the payments made pursuant to paragraph 11(c) of the Agreement were in the nature of a property settlement rather than support. Paragraph 11 is entitled "Property settlement," and although we are not bound by the label given to the payments, we have stated that the label may have some probative value where the provision for payments *38 was the subject of negotiations and each party was represented by counsel, and where separate provision was made for the payment of an amount for support and maintenance. Schottenstein v. Commissioner,supra at 457. In this latter connection, it is respondent's position that the consulting agreement between Test Builder, Inc. and Gladys was in reality an agreement on Charles' behalf to provide Gladys with support and maintenance payments and that there was never any intent that Gladys perform any services pursuant to that agreement. [4] In addition, the payments to be made pursuant to paragraph 11(c) of the Agreement were fixed in amount and not subject to termination upon the remarriage of Gladys or the death of either party. These factors have been considered indicative of a property settlement. Beard v. Commissioner,supra at 1285; Schottenstein v. Commissioner,supra at 457; Thompson v. Commissioner,supra at 526. Furthermore, Charles executed a confession of judgment note agreeing to pay interest from the date of any default and waiving the right of inquisition upon any real estate *39 which might be levied upon to collect sums owing under the note. Finally, the amount of the payments was not keyed to Charles' income, and the total amount of payments and other property received by Gladys, based on the valuation figures used by her attorney, fell short of an equal division of all property accumulated during marriage by only $34,430. On the other hand, and in support of petitioner's position, no interest was to be paid on the deferred $70,000 payment, except in the event of default. The absence of a provision for interest on the deferred payment tends to indicate that the amount was not intended to be consideration for a property settlement. Schottenstein v. Commissioner,supra at 459. In addition, there is some indication in the correspondence between the attorneys for the parties that the payments in question were intended to provide for the anticipated needs of Gladys. Cf. Beard v. Commissioner,supra at 1285. [5] Moreover, *40 the preamble of the final agreement contained the following provision: WHEREAS, the parties desire to make arrangements in connection with such separation, including the settlement of their property rights, the support and maintenance of Wife and other rights and obligations growing out of the marriage relationship. [Emphasis added.] Having examined the Agreement, it is apparent that the only provision which could be said to provide for the support and maintenance mentioned in the preamble is paragraph 11, the paragraph pursuant to which the disputed payment herein was made. [6]
*41 What we view as decisive in this case is that Gladys received, under provisions other than paragraph 11(c), properties at least equal in value to the properties she had an interest in at the time that the Agreement was executed. As petitioner points out, the Agreement was clearly structured in such a manner as to achieve an equal division of all the jointly-owned property. Paragraph 6 equally divided all of the jointly-owned personal property. Paragraph 7(a) provided for the procedure to be followed in disposing of the jointly-owned residence and further provided for an equal division of the net proceeds realized therefrom. Paragraph 7(b) recited that Gladys would convey to Charles within 45 days of execution of the Agreement all of her right, title, and interest in the jointly-owned Lochner Farm. Although no provision in the Agreement expressly provided for consideration to be paid to Gladys in return for her interest in the Lochner Farm, it is clear that the $78,000 payment called for in paragraph 11(a) of the Agreement was intended to constitute payment for Gladys' interest in the Lochner Farm. Not only was the payment to be made on precisely the same date as *42 conveyance, but the amount of the payment approximated one-half of the net value of the property established by an independent bank appraisal and exactly equaled the value of Gladys' interest in the Lochner Farm as referred to in correspondence exchanged between Mr. Yost and Mr. Senft. In short, the Agreement, exclusive of paragraph 11(c), provides for an equal division of every jointly-held asset. For the payments referred to in paragraph 11(c) of the Agreement to have been in discharge of a division of property, Gladys must have had an interest in property which she was relinquishing and for which the $70,000 was compensation. Cf. Warnack v. Commissioner,supra at 551; Wright v. Commissioner,62 T.C. 377, 390 (1974), affd. 543 F.2d 593 (7th Cir. 1976); Hesse v. Commisisoner,supra at 692. What we said in Schottenstein v. Commissioner,supra at 461, bears repeating in the present context: Where this Court has found that either there had been a substantially equal distribution of the community property or that the wife had by other provisions received property equal in value to the *43 interests she had in either her separate or marital property at the time of the divorce, so that the wife had no further tangible property rights that she could exchange for an interest in the husband's separate property, it has concluded that periodic payments in addition to the above were for support or alimony. In other words, if there was any ambiguity in the decree or agreement with respect to periodic payments, to support a conclusion that the payments are a division of property or a property settlement, the Court has required that the wife have tangible property rights that she gives up in exchange for a share of the husband's estate. * * * A wife's inchoate rights in her husband's property under common law has not been recognized as reaching the dignity of such an interest as to support a division of property among coowners. * * * On the other hand, foregoing specific rights given to a wife in her husband's property by State law has been held sufficient to support a division of property. * * * [Citations omitted.] In the instant case, we fail to find that Gladys had any tangible property rights, not otherwise accounted for, that she could exchange for the $70,000 *44 Charles agreed to pay her pursuant to paragraph 11(c) of the Agreement. Property interests are determined under state law. Schottenstein v. Commissioner,supra at 462. As we pointed out in a similar setting, Pennsylvania is not a community property state. Hesse v. Commissioner,supra at 692. See also Willcox v. Penn Mut. Life Ins. Co.,357 Pa. 581, 55 A.2d 521 (1947) (holding unconstitutional Pennsylvania's Community Property Law of 1947). Furthermore, during the year in issue Pennsylvania law made no provision for an equitable distribution upon dissolution of marrige of separately-titled property. Respondent contends that by virtue of her contribution of valuable services to Test Builder, Inc. Gladys acquired a substantial property interest in all of the property accumulated during the marriage, an interest which was recognized and provided for in paragraph 11 of the Agreement. for the following reasons, we disagree. First, our independent research of legislative changes in Pennsylvania law occurring after the year in issue leads us to conclude that respondent's contention will not withstand scrutiny as *45 a legal matter. In 1980, Pennsylvania enacted a new Divorce Code, Act of April 2, 1980, P.L. 63, section 101, et seq., 23 Pa. Cons. Stat. Ann., sec. 101, et seq. (Purdon Supp. 1984). The Divorce Code makes provision for the equitable distribution upon divorce of all property acquired during marriage. Among the numerous factors to be considered by a court in the equitable distribution process is "[t]he contribution or dissipation of each party in the acquisition, preservation, depreciation or appreciation of the marital property, including the contribution of a party as homemaker." 23 Pa. Cons. Stat. Ann, sec. 401(d)(7) (Purdon Supp. 1984). The Divorce Code has been described as a "drastic, and dramatic repudiation" of prior law. Gordon v. Gordon,293 Pa. Super. 491, 439 A.2d 683, 691 (1981), affd. per curiam 498 Pa. 570, 449 A.2d 1378 (1982). In Bacchetta v. Bacchetta,498 Pa. 227, 445 A.2d 1194, 1197 (1982), the Supreme Court of Pennsylvania stated as follows: Prior to the enactment of the Divorce Code, in many marriages a nonworking spouse contributed years of service to the family, but did not realize *46 any significant economic gain. Thus, upon divorce, nonworking spouses, who frequently had no marketable skills, were left with few, if any assets of their own and faced the risk of becoming public charges. By providing for the distribution of property acquired during marriage, the Divorce Code permits the correction of the economic injustices which often arose under former law and allows nonworking spouses to become self-supporting with the least financial hardship possible. We think it clear from the foregoing that respondent's argument that a wife acquires some sort of interest in property accumulated during marriage by virtue of her contributions to the acquisition of that property, while it might as a legal matter prove mertiorious with respect to years post-dating the enactment of the Divorce Code, is premature when made with respect to the year in issue. Secondly, even assuming such a property interest could exist during the year in issue, we would have to reject respondent's argument as a factual matter. While Gladys testified generally that she devoted substantial time and services to the family business, when questioned specifically with respect to the time *47 spent in performing those services and the extent of those services, her testimony was evasive and of little assistance. Furthermore, Charles' testimony, which was consistent with written statements of two of Test Builder, Inc.'s employees stipulated into evidence, contradicted Gladys' testimony. In short, the record simply does not establish the extent or the value of Gladys' services, and we cannot say that Gladys had any sort of interest in Charles' separately-titled property that corresponded to the $70,000 amount referred to in paragraph 11(c) of the Agreement. Based on the foregoing, we hold that the disputed payment was in the nature of support. Therefore, petitioner is entitled to deduct that payment pursuant to section 215. DECISION WILL BE ENTERED FOR THE PETITIONERS.
Footnotes
1. All section references, unless otherwise stated, are to the Internal Revenue Code of 1954 as amended and in effect for the year in issue.↩
2. An appraisal of the value of the Lochner Farm as of Jan. 22, 1976 was made by the vice president of the Bank of Hanover and Trust Company and indicated that the total net equity in the property was $157,521.52. Correspondence between Mr. Yost and Mr. Senft referred to the value of Gladys' interest in the Lochner Farm as being $78,000.↩
3. This schedule was stipulated into evidence by the parties. We note that paragraph 6 of the Agreement actually credited Gladys with an excess of $20 with respect to the division of the checking account rather than the savings account.↩
4. We do note that petitioner does not contend that any monies paid to Gladys pursuant to the consulting agreement are deductible under sec. 215↩ on his 1977 Federal income tax return.
5. Thus, for example, in response to one of the earlier proposals of provisions to be incorporated in the agreement, Mr. Senft, Gladys' attorney, wrote to Mr. Yost, Charles' attorney, as follows: The three areas where we are in serious disagreement are items 10 [a proposal to pay support for five years at $7,500 per year], 11 [a proposal to contribute $5,000 towards Gladys' counsel fees] and 12 [a proposal to pay Gladys an additional sum of $25,000] of your letter. * * * I have to assume at the end of five years it is improbable that Mrs. Test would be employed and hence her only means of support would be the income from the assets she could invest. In considering what she would have invested I have assumed that she would use the proceeds of item 3 [a proposal that Charles would purchase Gladys' 1/2 interest in the jointly-owned residence] to buy a home for herself and, of course, items 7 [a proposal to provide Gladys with an automobile] and 8 [a proposal to allow Gladys to retain certain furnishings] are non-income producing. Therefore she would have approximately $105,000 of income producing assets which, invested with safety, would not produce more than $7,500 annually. Obviously Mrs. Test could not afford to live on this. ↩
6. Based on the record, we might be inclined to agree with respondent that the "consulting agreement" was intended as the vehicle by which to provide Gladys with payments in the nature of support. However, even assuming such to be the case, we are not precluded from holding that the payments under paragraph 11(c) of the Agreement were likewise in the nature of support. Cf. Schottenstein v. Commissioner,75 T.C. 451↩ (1980).