HARRY A. MOORE AND RITA K. MOORE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; CATHERINE H. MOORE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Moore v. Commissioner
Docket Nos. 15571-85; 15851-85.[1]
United States Tax Court
T.C. Memo 1989-49; 1989 Tax Ct. Memo LEXIS 48; 56 T.C.M. (CCH) 1191; T.C.M. (RIA) 89049; February 2, 1989. Donald R. Lisle and Charles N. Woodward, for the petitioners in docket No. 15571-85. Richard F. McDivitt, for the petitioner in docket No. 15851-85. Bruce K. Meneely, for the respondent. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Judge: Respondent determined deficiencies and additions to tax for petitioners in the following amounts: Petitioner
Taxable Year Ended
Deficiency
Harry A. and
12/31/80
$ 15,000.00
Rita K. Moore
12/31/81
14,862.00
Docket No. 15571-85
12/31/82
6,219.00
Catherine H. Moore
12/31/80
$ 25,245.81
Docket No. 15851-85
12/31/81
22,876.64
12/31/82
25,774.30
After concessions, [2] the sole issue for our *50 determination is whether payments made by Harry Moore ("Harry") to Catherine Moore ("Catherine") during the taxable years 1980, 1981, and 1982 were in the nature of a property settlement or in the nature of an allowance for support. FINDINGS OF FACT Petitioners Harry and Rita Moore were husband and wife during the taxable years in issue and resided in Oklahoma City, Oklahoma, at the time they filed their petition *51 in this case. These petitioners timely filed joint Federal income tax returns for the taxable years 1980, 1981, and 1982. On March 5, 1985, respondent timely mailed to Harry and Rita Moore a statutory notice of deficiency determining deficiencies in these petitioners' joint income tax liabilities for the taxable years 1980, 1981, and 1982. Petitioner Catherine Moore resided in Oklahoma City, Oklahoma, at the time she filed her petition in this case. Catherine timely filed Federal income tax returns for the taxable years 1980, 1981, and 1982. She also filed an amended tax return for the taxable year 1980. On March 5, 1985, respondent timely mailed to Catherine a statutory notice of deficiency determining deficiencies in her income tax liabilities for the taxable years 1980, 1981, and 1982. Harry and Catherine were married on October 27, 1945. At the time of their marriage, Catherine was 22 years old [3] and was employed as a secretary and typist. When the couple's first child was born shortly after their marriage, Catherine became a housewife. Harry and Catherine separated on July 1, 1974. The catalyst provoking the couple's *52 separation was Catherine's alcoholism. Her drinking problem had developed over the course of a nine or ten year period preceding the couple's separation and required her hospitalization on more than one occasion. Harry filed for divorce on July 9, 1974. On September 27, 1974, Harry and Catherine executed an agreement entitled "Contract for Property Settlement and Alimony" (the "Contract"). The Contract was to provide for the final settlement and determination of the divorcing individuals' "respective property rights, alimony rights, and all other rights and claims existing or which might exist by reason of said marriage relation." On October 9, 1974, the divorcing couple obtained a decree of divorce and journal entry of judgment from the District Court of Payne County, Oklahoma. [4]
The Oklahoma district court in its decree approved the Contract, except for that portion of which constituted an agreement of the parties concerning child custody and child support. [5]The district court found that the divorcing couple had "made and executed a contract for property *53 settlement and alimony whereby they * * * settled and determined their respective claims concerning alimony rights, a division of all jointly acquired property, both real and personal, of which either or both of them [were] seized and possessed, and all other rights and claims existing or which might exist by reason of said marriage relation." Pursuant to the Contract and the divorce decree, Catherine was awarded the former couple's residence which was located in Cushing, Oklahoma, and was free of any mortgages; household goods, furniture and appliances; her personal effects, jewelry, and bank accounts or other property held or standing in her own name; and a new Cadillac automobile. The approximate value of the home and furnishings Catherine received was $ 125,000 to $ 150,000. Under the Contract and decree, Harry received land located in Kay County, Oklahoma; land located in Payne County, Oklahoma; *54 his personal effects; and all bank accounts, oil and gas leasehold interest and royalties, securities, stocks, and all other property registered, held, or maintained in his name. The land which Harry received was property which he either acquired or inherited from his family. In addition to this division of property, the divorce decree noted that Catherine was "entitled to alimony in an amount and payable in periodic installments" as set forth in the Contract. Paragraph 5 of the Contract provided for alimony payments as follows: 5. Party of the first part [Harry] shall pay unto party of the second part [Catherine] as support alimony the sum and amount of One Million and no/100 Dollars ($ 1,000,000.00), payable in monthly installments of Five Thousand and no/100 Dollars ($ 5,000.00) each, commencing on November 1, 1974, and payable on the first day of each month thereafter for two hundred (200) months. Said sum shall not draw interest except that payments not made when due shall draw interest at the rate of ten percent (10%) per annum. Said sums payable by the first party to second party shall not be a lien against real estate or other property of party of the first part *55 except those payments not made when due which are reduced to judgment by party of the second part. In the event of the death of second party before receiving all of said sum of money payable by first party to second party, then any such payments accruing subsequent to the death of party of the second part are to be paid as they accrue to the surviving children of party of the second part, Shelley Moore Hughes, Brad Moore, Jon Patrick Moore and Virginia Kay Moore, in equal shares, or their respective descendants, per stirpes. If any of such children should die leaving no descendants before the due date of any payment, then such payment to the extent of the deceased child's interest therein would fully abate. The obligation of the party of the first part to pay said sum of support alimony to party of the second part shall not abate or cease upon the death of either of the parties hereto, the remarriage of party of the second part, or change in the economic status of either of the parties hereto. [6] [Footnote reference added.] *56 Harry neither secured his $ 5,000 monthly payments which he timely paid by giving a general lien against his real estate or other property, nor specifically earmarked any life or disability insurance as a guaranteed source of funds to pay Catherine in the event of his untimely death or disability. Finally, the decree directed and ordered the divorcing couple to comply with the terms of their Contract, as modified, and with the provisions of the decree itself. As directed, Harry dutifully paid Catherine $ 5,000 per month, $ 60,000 per year, for each of the taxable years 1980, 1981, and 1982. In filing for divorce, Harry had prepared a schedule of assets, liabilities and net worth which he submitted during the divorce proceedings in 1974. The schedule was prepared on a cost basis and showed the former couple's net worth to be $ 458,959.67. All the assets reflected on the schedule were acquired during the time Harry and Catherine were married. One of the more important assets listed on the schedule was 187,200 shares of W. R. Grace and Company lettered stock with a then estimated total value of two million dollars. [7] Harry had received the lettered stock in May of 1974 *57 as payment for his partnership interest in Massey-Moore, an oil business which he and a partner had formed in 1954. At the time of the couple's separation, Catherine knew of this stock's existence but wanted no shares of it. With his contemplation of divorce, Harry sought the advice of Donald Worthington, an attorney who had represented Harry on a number of previous occasions and had met and knew Catherine. Harry relied upon Mr. Worthington to come up with a settlement proposal that was fair and reasonable under the circumstances. After many discussions with Harry over a three-week period, Mr. Worthington wrote the Contract. Prior to the execution of the Contract, Mr. Worthington and Harry's certified public account, John Torbett, advised Harry that in their opinions his $ 5,000 monthly payment to Catherine was deductible *58 by him as support alimony and was includible in Catherine's gross income. Before signing the Contract, Catherine spoke with Mr. Worthington on a number of occasions. One such meeting was held in July of 1974 at a Holiday Inn in Oklahoma City, Oklahoma. Catherine attended the meeting with her brother. The Contract was not, however, presented at this meeting for Catherine's signature. Subsequently, Catherine and Mr. Worthington met at Catherine's home in Cushing, Oklahoma. At this subsequent meeting, Catherine was presented with the Contract which she signed without reading. On October 9, 1974, the date the Oklahoma district court granted Harry and Catherine's divorce decree, Catherine arrived without legal counsel at the Cushing City Hall. There Harry told her that a number of cases preceded the disposition of their divorce case. On hearing this, Catherine returned home. After having been instructed by the Oklahoma court to do so, Mr. Worthington drove to Catherine's home to see if she wanted to return to the court to offer any evidence in her divorce case. She told Mr. Worthington that she wished to proffer no evidence. Mr. Worthington returned to the court and informed *59 the judge of Catherine's decision. With this information in hand, the Oklahoma district court granted Harry and Catherine's divorce decree and substantially approved the Contract. On March 31, 1976, Catherine filed a Motion to Vacate the October 9, 1974, Decree of Divorce and Journal Entry of Judgment. alleging that the decree and Contract were obtained through fraud and duress. In the Oklahoma district court proceeding tied to Catherine's motion, Harry testified that he had wanted Catherine to have half of the former couple's marital property. Mr. Worthington testified at this same proceeding that Harry had insisted that Catherine be awarded half the value of the property the divorcing couple had accumulated. Catherine's motion to vacate the October 9, 1974, Decree was denied on July 21, 1980. In vacating this motion the Oklahoma district court noted that "At the time of the execution of the property settlement, the alimony [Catherine] received, plus the home and furnishings, constituted approximately fifty percent of the total worth of the [divorcing] parties." Catherine then appealed the Oklahoma District Court's Order denying her Motion to Vacate to the Court of Appeals, *60 Division Three, State of Oklahoma. This appellate court, in an opinion filed on February 8, 1983, affirmed the district court's order denying Catherine's motion to vacate. In affirming the lower court opinion, this Oklahoma court stated, The record reflects that the trial court was fully apprised of Harry's assets and the method by which the assets were valued. * * * The $ 1,000,000 in alimony, coupled with the other real and personal property awarded Catherine, "constituted approximately fifty percent of the total worth of the [divorcing] parties." Reviewing the record as a whole, the property settlement is neither inequitable nor clearly against the weight of the evidence. * * * The Supreme Court of the State of Oklahoma, by an order dated April 18, 1983, denied certiorari. By order dated May 9, 1983, this same Oklahoma court declined to consider Catherine's petition for reconsideration of the April 18, 1983, Order. Catherine then filed a petition for a writ of certiorari with the Supreme Court of the United States. On September 6, 1983, Catherine filed an application to withdraw petition for certiorari and dismissal of appeal, which motion was granted by order of the *61 Supreme Court on September 21, 1983. At the time of the couple's separation and divorce, Catherine did not work due to arthritis in her hands and back and due to her drinking problem. On November 12, 1975, Catherine established her sobriety date, the date which followed the last date that she had ingested any form of mood-altering drug or liquor. Though Catherine's drinking problem ended, her arthritic condition continued through the date of this Court's trial of the case. Harry and Rita Moore deducted the $ 60,000 paid to Catherine as alimony on their 1980 through 1982 Federal income tax returns. Catherine did not include the monthly payments as income on her 1980 through 1982 Federal income tax returns. Respondent in the statutory notices of deficiency, disallowed the alimony deduction claimed by Harry and Rita Moore and included the payments in Catherine's gross income. OPINION The issue before us is whether Harry's payments to Catherine during the taxable years in issue are support payments or are payments in satisfaction of a property settlement. Former section 71(a)(1) included in a wife's gross income periodic payments received in discharge of a legal obligation *62 which, because of the marital or family relationship, is imposed on or incurred by the husband under a divorce decree or written instrument incident to the divorce. [8]Section 215 allows a deduction to the husband for payments made to his wife which are includible in her income under section 71. [9]
*63 Paragraph 5 of the Contract provides for payments totaling one million dollars payable in monthly installments of $ 5,000 per month beginning November 1, 1974, and continuing for 200 months. These monthly payments defined in the Contract were approved in the former couple's divorce decree; and Harry, as directed by this decree, complied with the Contract's payment terms. Consequently, we find that Harry's payments are imposed under a decree of divorce or written instrument incident thereto as required by section 71(a)(1). The "periodic" requirement of section 71(a)(1) is amplified in section 71(c). [10]Section 71(c)(1) states that installment payments which discharge an obligation to pay a principal sum specified in a divorce decree or separation agreement cannot qualify as periodic payments. An exception to this general rule is provided in section 71(c)(2), which states that installments which are to be paid over a period ending more than 10 years from the date of the decree or agreement will be considered periodic payments, but only to the extent of 10 percent of the principal sum in any one taxable year. In the instant case, Harry's payments extend over a period of time in *64 excess of 16 years. Additionally, at no time during this period do Harry's total yearly payments exceed 10 percent of the principal sum specified in the Contract. Noting such, we find that Harry's monthly $ 5,000 payments qualify fully as periodic payments. *65 Since Harry's payments are periodic and are imposed under a decree of divorce, the only remaining question is whether the payments are in discharge of a legal obligation or are installment payments made in satisfaction of a property settlement. The requirement that the payments be made in discharge of a legal obligation imposed "because of the marital or family relationship" has been interpreted to require that the payments be in the nature of support rather than a property settlement. Warnack v. Commissioner,71 T.C. 541 (1979); Bishop v. Commissioner,55 T.C. 720 (1971); secs. 1.71-1(b)(4) and 1.71-1(d)(3)(i)(b), Income Tax Regs.Payments which are part of a property settlement are capital in nature and, therefore, not taxable to the recipient. Yoakum v. Commissioner,82 T.C. 128, 134 (1984); Thompson v. Commissioner,50 T.C. 522, 525 (1968). It is well settled that the determination of whether payments are in the nature *66 of support or are part of a property settlement does not turn on the labels assigned to the payments by the Court in the divorce decree or by the parties in their agreement. Hesse v. Commissioner,60 T.C. 685, 691 (1973), affd. without published opinion 511 F.2d 1393 (3d Cir. 1975), cert. denied 423 U.S. 834 (1975); Thompson v. Commissioner,50 T.C. at 525; Bardwell v. Commissioner,38 T.C. 84, 89-90 (1962), affd. 318 F.2d 786 (10th Cir. 1963). The issue is a factual one and requires an examination of all the surrounding facts and circumstances. Wright v. Commissioner,62 T.C. 377, 389 (1974), affd. 543 F.2d 593 (7th Cir. 1976); Hesse v. Commissioner,60 T.C. at 691. Factors which indicate that the payments are in the nature of a property settlement rather than a support allowance are: (1) That the parties in their agreement (or the court in its decree) intended the payments to effect a division of their assets, Porter v. Commissioner,388 F.2d 670, 671 (6th Cir. 1968), *67 affg. per curiam a Memorandum Opinion of this Court; Wright v. Commissioner, supra; (2) that the recipient surrendered valuable property rights in exchange for the payments, Mann v. Commissioner,74 T.C. 1249, 1259-1262 (1980); Gammill v. Commissioner,73 T.C. 921, 928-929 (1980), affd. 710 F.2d 607 (10th Cir. 1982); Warnack v. Commissioner,71 T.C. at 550-551; (3) that the payments are fixed in amount and not subject to contingencies, such as the death or remarriage of the recipient, Widmer v. Commissioner,75 T.C. 405, 409 (1980); McCombs v. Commissioner,397 F.2d 4, 7 (10th Cir. 1968), affg. a Memorandum Opinion of this Court; Land v. Commissioner,61 T.C. 675, 683 (1974); (4) that the payments are secured, Widmer v. Commissioner, supra;Gammill v. Commissioner,73 T.C. at 929; (5) that the amount of the payments plus the other property awarded to the recipient equals approximately one-half of the property accumulated by the parties during the marriage, Lambros v. Commissioner,459 F.2d 69, 71-72 (6th Cir. 1972), *68 affg. a Memorandum Opinion of this Court; Schottenstein v. Commissioner,75 T.C. 451, 464 (1980); (6) that the need of the recipient was not taken into consideration in determining the amount of the payments, McCombs v. Commissioner, supra; and (7) that a separate provision for support was provided elsewhere in the decree or agreement. Schottenstein v. Commissioner,75 T.C. at 457. Conversely, the absence of one or more of the above factors may tend to indicate that the payments are more in the nature of a support allowance. Beard v. Commissioner,77 T.C. 1275, 1284-1285 (1981). We begin our inquiry with an analysis of the statutory and judicial authority governing the division of property and the awarding of alimony in Oklahoma. We also note that state law defines property rights while Federal law determines the tax consequences which attend these defined rights. Sampson v. Commissioner,81 T.C. 614, 618 (1983), affd. without published opinion 829 F.2d 39 (6th Cir. 1987); cf. Poe v. Seaborn,282 U.S. 101, 110 (1930). *69 Under Oklahoma law, the term "alimony" refers to both support payments and to a division of property. See Funnell v. Funnell,584 P.2d 1319 (Okla. 1978); Cox v. Cox,543 F.2d 1277 (10th Cir. 1976). Thus, the Oklahoma trial court's use of the word "alimony" in any particular case is not instructive, particularly where the divorce decree is silent as to whether the payments are for support or division of property. Yoakum v. Commissioner,82 T.C. at 136. The pertinent Oklahoma statutory provision in effect for the years in issue (Okla Stat. Ann. tit. 12, sec. 1289(b) (West Supp. 1988)), provided as follows: In any divorce decree which provides for periodic alimony payments, the court shall plainly state, at the time of entering the original decree, what dollar amount of all or a portion of each such payment is designated as support, and what dollar amount of all or a portion of such payment is a payment pertaining to a division of property. Upon *70 the death of the recipient, the payments for support, if not already accrued, shall terminate, but the payments pertaining to a division of property shall continue until completed; and the decree shall so specify. The payments pertaining to a division of property shall be irrevocable. Upon the presentation of proper proof of the death of such recipient, the court shall order the judgement for the payment of support to be terminated, and the lien thereof released unless a proper claim shall be made for any amount of past due support payments by any executor, administrator or heir within ninety (90) days from the date of death of the recipient. The court shall also provide in the divorce decree that any such payment of support shall terminate after remarriage of the recipient, unless the recipient can make a proper showing that some amount of support is still needed and that circumstances have not rendered payment of the same inequitable. Provided, however, that unless the recipient shall commence an action for such determination within ninety (90) days of the date of such remarriage, the *71 court shall, upon proper application, order the support judgement terminated and the lien thereof discharges. [11] [Footnore reference added.] In construing similar statutory language, the Oklahoma Supreme Court has noted that a trial court may designate a portion of any payment as support only at the time of entering the original divorce decree and cannot later modify, alter, or amend the divorce decree to so provide. [12]Shea v. Shea,537 P.2d 417, 419 (Okla. 1975). *72 Additionally, under Oklahoma law, authority exists for the proposition that the failure of the Oklahoma trial court to designate the payments as for support or to provide for their termination upon the death or remarriage of the recipient mandates a finding that such payments are not for support but constitute, instead, a division of property. Gird v. Gird,45 O.B.A.J. 2088 (Okla. Ct. App. 1974). Cf. Shea v. Shea, supra.The Tenth Circuit Court of Appeals, to which, absent a stipulation to the contrary, any appeal in this case would lie, has cited Gird as authority for the rule that, under Oklahoma law, alimony payments that do not terminate upon death or remarriage are statutorily treated as a division of property. See Cox v. Cox, supra.
In the case at hand, we note that paragraph 5 of the Contract states that Harry must pay Catherine as "support alimony" an amount equal to $ 5,000 per month for 200 months. The district court approved the Contract and mentioned that the Contract represented a settlement and determination of *73 the respective claims of Harry and Catherine "concerning alimony rights, a division of jointly acquired property, both real and personal, * * *, and all other rights and claims existing or which might exist by reason of [the former couple's] marriage relation." In its approval of the Contract, the Oklahoma district court noted that Catherine was "entitled to alimony in an amount and payable in periodic installments" as set forth in the Contract. This Oklahoma court's statement concerning alimony payments, however, focused solely on the amount and timing of the payments without describing these monthly payments as payments of "support alimony." Moreover, in reexamining the divorce decree in its denial of Catherine's motion to vacate judgment, this same district court declared, "At the time of the execution of the property settlement, the alimony [Catherine] received, plus the home and furnishings, constituted approximately fifty percent of the total worth of the [divorcing] parties." This Oklahoma court's emphasis on the divorcing couple's worth at the time of their marital dissolution and the desire to have this division of worth approximate fifty percent strengthens the view *74 that the district court intended the $ 5,000 monthly payments mentioned in its decree to be payments effecting an equitable division of the former couple's marital property. [13]
We also point out that the Oklahoma appellate court in its affirmance of the district court's vacation denial similarly used language in its opinion which suggests that the alimony payments established in the divorce decree were meant to be payments affecting a distribution of property. This appellate court stated that the alimony payments, coupled with the division of property, constituted an approximately equal division of the divorcing couple's worth and that this "property settlement" was neither inequitable or clearly against the weight of evidence. In establishing the intent with which each signor of the Contract executed that document, both Catherine and Harry testified. Catherine testified that she signed the contract *75 intending the $ 5,000 payments to represent payments for her interest in the couple's property acquired during their marriage. Catherine's desire to have the payments made to her children after her death lends credence to her claim that the payments were tied to a property settlement. [14] Her desire can been seen as an attempt to ensure that the total $ 1,000,000 sum was received by either her or a party of her choosing. Harry testified that, in signing the Contract, he had intended that the $ 5,000 payments represent support to his wife. He had, however, testified before the district court considering Catherine's motion to vacate that he intended Catherine to receive half of the former *76 couple's marital property. These inconsistent statements of intent by Harry lend no credibility to his testimony before this Court concerning his approval of the Contract's paragraph 5. We, consequently, give this testimony no effect. In support of his testimony, Harry also introduced Messers. Worthington [15] and Torbett as witnesses. Both these men stated that they had advised Harry that his $ 5,000 payments were deductible by him and includible in Catherine's gross income. In testifying before us, however, Mr. Torbett has not satisfactorily convinced us that he understood the intricacies of local law associated with Oklahoma's governance of divorces and that he took such intricacies into account in advising Harry. Moreover, Mr. Worthington's testimony is not substantially supported by evidence characterizing his familiarity with the nuances surrounding the Federal taxation of divorce payments. Additionally, Mr. Worthington acknowledged that he had previously told the district court reviewing Catherine's motion to vacate that Harry had insisted that Catherine be awarded half the value of the property the divorcing couple had accumulated. *77 To resolve the issue before us then, we note Catherine's stated intent and primarily rely both on the intent of the Oklahoma district court in formulating the divorce decree, which intent we have above-mentioned suggests that this lower Oklahoma court meant the monthly payments to be payments in satisfaction of a property settlement, and on other factors which we subsequently discuss. We now look to whether Catherine has surrendered valuable rights in exchange for her receipt of the monthly payments. In Yoakum v. Commissioner,82 T.C. at 141, we found that, under Oklahoma law, the wife in that case, the recipient of disputed alimony payments, had "relinquished property interests in return for the payments." To reach this finding, we noted that the Court of Appeals for the Tenth Circuit had declared, Even though Oklahoma is not a community property state, it does recognize the equity of the wife in property which has accumulated during the continuance of the marriage and allows appropriate division to be made. The wife's interest in jointly acquired property vests *78 on the pendency of the divorce. [Yoakum v. Commissioner,82 T.C. at 142, (citing Gammill v. Commissioner, 710 F.2d at 610).] [16]
Neither respondent nor either petitioner has suggested that this finding in Yoakum and its supporting analysis is no longer valid. Noting such, we hold that Catherine has relinquished valuable property rights "in property which [was] accumulated during the continuance of [her] marriage" to Harry and that this relinquishment was in exchange for her receipt of the $ 5,000 payments. We next consider the contingencies governing the payment of the monthly sums. The Contract is clear that the payments are to continue regardless of Catherine's remarriage, of the death of either *79 Catherine or Harry, and of changes in the economic status of either Catherine or Harry. Under Oklahoma law, a failure of an alimony payment to terminate upon the remarriage or death of the recipient leads to a conclusion that the payment effects a division of property. See Cox v. Cox, supra.We can infer from the Contract's lack of contingency language that the payments in dispute represent payments tied to a property settlement. The fourth factor we examine is whether the payments in question are secured. The Contract states that the payments are not to be secured by a lien against any real estate or other property owned by Harry except to the extent of payments not made when due which are reduced to judgment by Catherine. Additionally, no insurance proceeds have been earmarked by Harry as a source of funds for the payments on his untimely death or disability. The absence of security is a factor more indicative of a support payment. This absence is, however, balanced by other considerations. Nonpayments reduced to judgment could constitute a lien on Harry's property. Furthermore, in the event of Harry's untimely death, any payments owed Catherine would represent *80 a debt of his estate to be paid in timely order. See Okla. Stat. Ann. tit. 58, sec. 591 (West Supp. 1988). The fifth factor focuses on whether the amount of the payments plus other property awarded to the recipient equal approximately one-half of the property accumulated by the divorcing parties during their marriage. The primary asset acquired by the divorcing couple during their marriage was the W. R. Grace stock. Though the stock was lettered stock, its estimated value at the time of the couple's divorce was two million dollars. [17] Catherine's receipt of property valued at about $ 125,000 to $ 150,000 and her receipt of payments aggregating to one million dollars justify the contention that the divorcing parties in their executed Contract were attempting to approximate an equal division of the value of their marital property. [18] The Oklahoma district and appellate courts reviewing Catherine's vacating motion also noted that there was an approximately equal division of the former couple's marital property. *81 The sixth factor rests on the recipient's needs and whether such needs were taken into consideration in determining the amount of the payments. Mr. Worthington testified that Harry had wanted to provide support alimony and that Harry had asked him for advice as to a sum which would be reasonable and fair under the circumstances. Harry testified that he had desired that the payments represent support payments because he saw himself providing for an individual who "couldn't do much of a job at the time of providing for themselves." We also note that at the time of the execution of the Contract Catherine was unemployable because of her arthritis and drinking condition. This testimonial evidence and evidence of Catherine's then unemployability imply that the monthly payments are for support. This implication is, however, weakened by our noting that no documentary evidence or clear testimonial evidence has been presented which would suggest that the divorcing parties had actually estimated Catherine's projected monthly needs and by Harry's testimony before the district court considering Catherine's vacating motion that he intended to give Catherine half the marital property. The *82 seventh factor focuses on whether the Contract makes provisions for support elsewhere in its language. In this case, the only provision for alimony is found in the Contract's fifth paragraph, so there is no conclusive consideration either way in this respect. Having carefully weighed the evidence in this case, we find that the disputed payments are payments in satisfaction of a property settlement. The weight of the evidentiary factors to be considered tips the scales heavily to a division of property. Consequently, the payments are not includible in the income of Catherine and are not deductible by Harry. To reflect the foregoing, Decision will be entered for respondent in docket No. 15571-85.
Decision will be entered under Rule 155 in docket No. 15851-85.
Footnotes
1. These cases were consolidated pursuant to Rule 141(a) of the Tax Court Rules of Practice and Procedure. Unless otherwise indicated, section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Respondent concedes adjustments 1.b. and 1.h. in the statutory notice of deficiency issued to Catherine Moore. Petitioner Catherine Moore concedes statutory notice of deficiency adjustment 1.g. Additionally, Catherine concedes statutory notice of deficiency adjustments 1.c. and 1.d., as these adjustments were not placed in dispute in the petition. Finally, adjustments 1.e., 1.f., and the adjustments to investment tax credits for the taxable years 1980, 1981, and 1982 in the statutory notice of deficiency issued to Catherine are automatic adjustments resulting from changes to her income. The notice of deficiency sent to Harry and Rita Moore, listed agreed-to adjustments in the following total yearly sums: 1980 - $ 19,401; 1981 - $ 4,736; and 1982 - $ 4,673.↩
3. Catherine was born on January 8, 1923.↩
4. Catherine was diagnosed an alcoholic at the time of the granting of the divorce and the execution of the Contract.↩
5. Under the divorce decree, Catherine was awarded custody of Jon Patrick Moore, a minor, and $ 250 per month for the support of this minor. Harry was awarded custody of Virginia Kay Moore, also a minor. At the time of the couple's divorce, both minors were in their mid-teens.↩
6. Those statements in the Contract concerning the continued payment of the $ 5,000 sum to the divorcing couple's children on Catherine's death were added at Catherine's behest. Harry readily agreed to this request of Catherine.↩
7. The W. R. Grace stock generated over $ 215,000 in dividends in 1974. The stock was also subject to certain restrictions placed on its transfer, and, because the stock had a low tax cost basis, any subsequent sale of it by Harry would have generated significant taxable gains. On the schedule of assets, Harry listed the stock at a cost of $ 186,608.38.↩
8. Sec. 71(a)(1) states as follows: (a) GENERAL RULE. -- (1) DECREE OF DIVORCE OR SEPARATE MAINTENANCE. -- If a wife is divorced or legally separated from her husband under a decree of divorce or of separate maintenance, the wife's gross income includes periodic payments (whether or not made at regular intervals) received after such decree in discharge of (or attributable to property transferred, in trust or otherwise, in discharge of) a legal obligation which, because of the marital or family relationship, is imposed on or incurred by the husband under the decree or under a written instrument incident to such divorce or separation. ↩
9. Sec. 215(a) states as follows: (a) GENERAL RULE. -- In the case of a husband described in section 71, there shall be allowed as a deduction amounts includible under section 71 in the gross income of his wife, payment of which is made within the husband's taxable year. No deduction shall be allowed under the preceding sentence with respect to any payment if, by reason of section 71(d) or 682↩, the amount thereof is not includible in the husband's gross income.
10. Sec. 71(c) states as follows: (c) PRINCIPAL SUM PAID IN INSTALLMENTS. -- (1) GENERAL RULE. -- For purposes of subsection (a), installment payments discharging a part of an obligation the principal sum of which is, either in terms of money or property, specified in the decree, instrument, or agreement shall not be treated as periodic payments. (2) WHERE PERIOD FOR PAYMENT IS MORE THAN 10 YEARS. --If, by the terms of the decree, instrument, or agreement, the principal sum referred to in paragraph (1) is to be paid or may be paid over a period ending more than 10 years from the date of such decree, instrument, or agreement, then (notwithstanding paragraph (1)) the installment payments shall be treated as periodic payments for purposes of subsection (a), but (in the case of any one taxable year of the wife) only to the extent of 10 percent of the principal sum. For purposes of the preceding sentence, the part of any principal sum which is allocable to a period after the taxable year of the wife in which it is received shall be treated as an installment payment for the taxable year in which it is received.↩
11. This version of the Oklahoma statute represented a 1979 amendment to the statute as it existed in 1976. This amending version had an effective date of October 1, 1979. Okla Stat. Ann. tit. 12, sec. 1289↩(b) (West Supp. 1988).
12. The statutory language on which the Oklahoma Supreme Court relied in reaching its conclusion is as follows: (b) In any divorce decree entered after December 31, 1967, which provides for periodic alimony payments, the Court, at the time of entering the original decree, only, may designate all or a portion of each such payment as support, and all or a portion of such payment as a payment pertaining to a division of property. Upon the death of the recipient, the payments for support, if not already accrued, shall terminate, but the payments pertaining to a division of property shall continue until completed; and the decree shall so specify. The payments pertaining to a division of property shall be irrevocable. * * * The Court shall also provide in the divorce decree that any such support payments shall terminate after remarriage of the recipient, unless the recipient can make a proper showing that said support is still needed and that circumstances have not rendered payment of the same inequitable; provided, however, that unless the recipient shall commence an action for such determination within ninety (90) days of the date of such remarriage, the Court shall, upon proper application, order the support judgment terminated and the lien thereof discharged. * * * [Shea v. Shea,537 P.2d 417, 418 (Okla. 1975), citing Okla. Stat. Ann. tit. 12 sec. 1289↩(b) (West 1961).]
13. In reexamining the decree in its denial of Catherine's motion, the Oklahoma district court does not appear to be modifying, altering, or amending its earlier decree as prohibited by the Oklahoma Supreme Court in Shea v. Shea,537 P.2d 417, 419↩ (Okla. 1975).
14. The Contract states that "any such payments accruing subsequent to the death of the party of the second part [Catherine] are to be paid as they accrue to the surviving children of party of the second part, Shelley Moore Hughes, Brad Moore, Jon Patrick Moore and Virginia Kay Moore." (Emphasis added.) This language of the Contract is noticeably conspicuous in its failure to designate that the payments were to continue to the surviving children of the divorcing couple's marriage.↩
15. Catherine testified that she had not hired her own attorney because she was under the impression that Mr. Worthington was to consider her interest, as well as those of Harry. Catherine's failure to hire left Mr. Worthington in an unenviable position of having to deal with an individual who was unrepresented by independent counsel in a fractious situation and with whom he had previously been on friendly terms.↩
16. Had Harry transferred half the W. R. Grace stock to Catherine in exchange for her surrendered rights in the divorcing couple's accumulated marital property, it is unlikely that he would have had to recognize a gain on the transfer as then required by United States v. Davis,370 U.S. 65 (1962). See Collins v. Commissioner,412 F.2d 211 (10th Cir. 1969), revg. 46 T.C. 461↩ (1966).
17. Mr. Worthington testified that the stock was valued at about two million dollars in a study of the total value of the couple's joint assets conducted "during the pendency of the divorce action." ↩
18. As an aside, we point out that, if the stream of monthly payments is discounted to its present value at the time of the couple's divorce, Catherine is, in actuality, receiving less than 50 percent of the total worth of the divorcing couple's marital property.↩